## BACKUS v. TAPLIN.

### No. 5451.

Circuit Court of Appeals, Seventh Circuit.

Jan. 30, 1936.

your holdings of stock in The Pittsburgh & West Virginia Railway Company during the life of the Syndicate, then such holdings of stock shall be treated the same as the stock in the Syndicate; that is, upon any disposition of the stock held by the Syndicate as a part of any transaction passing control of The P. & W. Va. Railway Company, (a majority of the stock of said company being held by the Syndicate and other parties with whom agreements similar to this are had), your stock shall be included in any such transaction, and you shall receive the same price for your stock as is received for the Syndicate's holdings.

"Will you kindly indicate your agreement with this method of holding and disposing of your stock in The P. & W. Va. Railway Company, and oblige.

"Yours very truly,

"S                    F. E. Taplin.

"Four thousand shares of Pittsburgh & West Virginia stock is held by E. W. and S. W. Backus.

"The above represents my understanding and I agree not to sell my holdings of stock in The P. & W. Va. Railway Company except in accordance therewith.

"E. W. Backus

"Seymour Backus."

The present litigation is over an alleged enlargement of this agreement to include shares of stock in said company acquired by appellant after June 6, 1927.

Appellant [1] increased his holdings of this stock to 8,140 shares which he was holding on October 16, 1929, when the syndicate was closed through the sale of the stock for $170 per share. Included in this sale were 4,000 shares of appellant's stock. Appellant, however, had 4,140 more shares of this stock, 4,000 of which were deposited in the Chase National Bank at the time as security for a large obligation.

Appellant alleged, and on the trial offered to prove, a modification of the above-quoted written agreement. Appellee denied that any modified or new agreement was ever made or considered, and further that if such agreement, as appellant offered to prove, were ever made, it rested in parol and was therefore within the prohibitive provisions of the Statute of Frauds

---

Edward L. Boyle and H. B. Fryberger, both of Duluth, Minn., Harris Richardson, of St. Paul, Minn., and John S. Sprowls and Lyman T. Powell, Jr., both of Superior, Wis., for appellant.

W. P. Crawford, of Superior, Wis., and Pierce Butler, Jr., and R. O. Sullivan, both of St. Paul, Minn., for appellee.

Before EVANS, SPARKS, and AL-SCHULER, Circuit Judges.

EVANS, Circuit Judge.

On June 6, 1927, the parties made the following written agreement:

"Dear Mr. Backus:

"Confirming our talk, it is understood that if you will agree not to dispose of

---

[1] Appellant acquired the interest of E. W. Backus, his father, before this suit was begun, and either father or son or both are included when "appellant" is used.

of the State of Wisconsin, which statute both appellant and appellee tacitly assume to be controlling.

The trial court concluded that such a modification fell within the condemnation of the Statute of Frauds and was therefore not binding upon the parties. He therefore excluded the evidence which appellant asserted would have tended to establish the existence of a modified agreement. He also held that there was no partial performance or other act which would, if proved, have taken the agreement out of the statute.

Appellant's contentions are: (1) The evidence which was rejected would at least have made a jury question as to the existence of a modified agreement. (2) The modified agreement was valid, even though it was in parol. (3) There was a partial performance of the modified agreement which took it out of the Statute of Frauds. (4) The stock which was delivered was outside of the 4,000 shares covered by the agreement and therefore appellant could rely upon a breach of the written contract as to the remaining shares.

Appellee contends that no modification was made and further that any parol agreement was unenforceable.

■ *Statute of Frauds.* It is argued that the legality of the contract is governed by the laws of Wisconsin. Straesser-Arnold Co. v. Franklin Sugar Refining Co. (C.C.A.) 8 F.(2d) 601. The applicable sections of the Statute of Frauds [2] of that state are set forth in the margin.[3] In considering whether they govern, we are safe in assuming that the modification is subject to the same test (that of being in writing) as to its validity as the original contract. In other words, if validity of the original depends upon its being in writing, so must the validity of the modification thus depend. Emerson v. Slater, 22 How. 28, 16 L.Ed. 360; Swain v. Seamens, 9 Wall. 254, 19 L.Ed. 554.

■ We are first confronted by the question, Is corporate stock "goods" within the meaning of the Statute of Frauds? There may be some doubt arising from the decisions elsewhere as to whether "corporate stock" is "goods" as used in the Statute of Frauds, but for Wisconsin the question is settled by the decision of Mahoney v. Kennedy, 172 Wis. 568, 179 N.W. 754, and favorably to appellee's position. See also, 14 A.L.R. 394, supplemented in 59 A.L.R. 597.

■ Perhaps more uncertainty attends the answers to the questions: Was the agreement established, a sales contract? Was the contract one which *may be performed* within a year?

Both of these questions we answer in favor of appellant. The first one, No; the second one, Yes. That is to say, the broker, appellee, did not agree to buy the stock. He acted as an agent. Simons v. Rubin, 145 Misc. 761, 260 N.Y.S. 776; Campbell v. Willis, 53 App.D.C. 296, 290 F. 271; Wiger v. Carr, 131 Wis. 584, 111 N.W. 657, 11 L.R.A.(N.S.) 650, 11 Ann. Cas. 998. We also hold that the contract was one which might be performed within a year. Warner v. Texas & Pac. R. Co., 164 U.S. 418, 17 S.Ct. 147, 41 L.Ed. 495; Walker v. Johnson, 96 U.S. 424, 24 L.Ed. 834; McPherson v. Cox, 96 U.S. 404, 24 L.Ed. 746.

■ Did the proffered evidence, assuming it was received, require the issue of modification to be submitted to the jury?

The issue is comparatively simple, but the facts are more or less buried in a mass of correspondence and figures. When all the evidence is sifted and analyzed, it points insistently to but one conclusion.

Appellant asserts the written agreement was modified by parol—the modification

---

[2] The Statutes of Frauds of Wisconsin, Ohio, and New York are the same.

[3] Wisconsin Statutes, 1933. "121.01 (1) A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price * * *."

"121.04 (1) A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

"241.02 In the following case every agreement shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith:

"(1) Every agreement that by its terms is not to be performed within one year from the making thereof."

consisting of an enlargement of the scope of the written agreement. Instead of 4,000 shares which appellee in writing agreed to include in the syndicate and which appellant agreed to hold off the market, the latter says the agreement as modified permitted him to purchase at *any* time *any* amount he chose and appellee would include it in the syndicate agreement. In return appellant was to hold the stock off the market. He could not sell stock by him acquired, save, of course, as the agreement might be modified. Appellant went further and offered to prove that when the syndicate sold its coverages, appellee told appellant what certificates of stock to deliver to the representatives of the purchaser.

Appellee's argument is that his adversary's story is so inherently weak, so "wildly fantastical," as to necessitate disbelief and that if a verdict were rendered in appellant's favor, it should and would not be allowed to stand.

To support this position, appellee must needs present a strong case. For controverted fact issues are for the jury, and only in unusual cases may the surrounding facts and circumstances so overwhelm the story of one party as to require a court to reject the story though supported by a verdict.

The number of such cases is seemingly on the increase,[4] however, and courts, without invading the province of a jury, have, with greater frequency, exercised their power to set aside verdicts which were either shockingly perverse, or quite irreconcilable with the dominant and controlling facts which were established with certainty and which facts furnished the cornerstones for verdict or findings. While action in such situations rests in the exercise of a sound discretion by the trial court, it is apparent that at times, at least, courts add respect to the final judgments and also promote justice when they fearlessly and fully exercise the power in them lodged. And this duty extends in some cases to directed verdict action rather than merely to granting a new trial after verdict.

It is needless to observe that the question before us is over the propriety of a directed verdict in the face of proffered proof by an interested party which evidence, figuratively speaking, scrapped a contract which the parties had recently taken the pains to reduce to writing. In other words, the question is whether the testimony offered by appellant was so unreasonable and improbable and so contrary to the action of appellant at other times as to justify or necessitate its rejection. Unfortunately, it is impossible to dispose of this question in a few words.

The parties to the agreement which is the basis of this litigation were both widely experienced business men. Both were accustomed to speculate, to take substantial losses, and to make like profits. They dealt in large sums. Appellant was no stranger to litigation where alleged stock promotion frauds were the *casus belli*. Both were experienced in the stock exchange jargon, in the operation of pools in stock, and the uses to which syndicates might be put to secure and control larger stock transactions and profits. Their knowledge was based on experience.

It appears that their first meeting was casual, not prearranged. A common interest in the stock market led to discussion. Appellee apparently aroused appellant's interest in a railway stock in which he (appellee) was interested and concerning which he spoke with apparent knowledge as to market values. Appellant, shortly after, acquired some of this stock (P &W). Later visits led to appellee's suggestion of a syndicate in which he invited appellant to join. Appellant lived in Minneapolis; appellee, in Cleveland. Both were frequently in the same hotel in New York and in close touch with the brokers' offices there existing.

The plans for the syndicate developed rapidly. Appellant placed his stock (about 4,000 shares) in the syndicate. Almost before the syndicate was closed, however, he sold 700 shares of this stock, and thus provoked the wrath of, and a sharp rebuke from, appellee. The differences were soon composed. The agreement, represented by telegrams, letters, and conversations, was succeeded, however, by the written agreement above set forth.

Appellee drew this agreement and forwarded it to appellant who signed and returned it. At this point the first significant

4 A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597; Garrett v. Penn. Ry. Co., 47 F.(2d) 10 (C.C.A.7); Arkansas Valley Land & Cattle Co. v. Mann, 130 U.S. 69, 9 S.Ct. 458, 32 L.Ed. 854; Ruling Case Law, "Trial," vol. 26, § 75, also "New Trial," vol. 20, § 136.

bit of evidence appears. Appellant did not state the number of shares he owned and which he was to hold off the market. The recent sale of 700 shares doubtless accounted for appellee's insistence. He returned the contract and demanded that appellant state the number of shares affected by this agreement and for which he was to be obligated. The appellant added the first line to his agreement and returned it duly executed.

Appellant urges that this written agreement was almost immediately enlarged by oral agreement so that it included *any* stock he might purchase at *any* time. While such a modification was not inconceivable, yet, in view of the care taken to designate the number of shares and appellee's refusal to accept appellant's agreement not to sell his stock without the number being stated, such action calls for an explanation which has not been satisfactorily made. Not only did the designation of the number of shares of stock affect appellant's rights and obligations, but it would be difficult to conceive of appellee's operating a syndicate when he did not know the amount of stock he was to deliver in case a purchaser, ready and willing to buy, appeared. Moreover, the larger the number of shares over and above a majority (or sufficient to control), the greater the disadvantage under which the syndicate operator labored.

Nor was this all.

After the agreement was executed, appellant immediately purchased for his own account, over and above the 4,000 shares covered by the syndicate agreement, 4,140 shares of this stock. His total holding when the syndicate was closed out, October 16, 1929, was 8,140 shares. About one year after he, increased his holdings, there was a most significant exchange of telegrams between the parties. On April 4, 1928, appellant wired appellee:

"Took up from brokerage house four thousand average one fifteen bought eighteen hundred during last year still in brokers hands average one thirty two fifty five Stop Wire your advice Stop Blackstone Chicago tomorrow and balance week." The wire referred to P & W stock. The following reply also referred to the same stock:

"If it goes below forty looks to me like a purchase for it is likely to sell much higher next week Stop Do not want to advise but that is way it looks to me."

These telegrams passed a year after the syndicate was formed and when it was in full force. If the syndicate agreement were enlarged by verbal agreement so as to include appellant's after-acquired P & W stock, then appellant obviously could not sell this stock. Withdrawal from sale of appellant's stock covered by the syndicate agreement was an essential part of that contract.

In these telegrams, however, appellant asked appellee for advice as to what he should do with his P & W holdings. It can only fairly be construed as a request for advice on advisability of selling stock in P & W. Likewise, the mention of the 4,000 shares rather suggests that the two holdings were on a different footing. One dealt with the 4,000 shares and was covered by the written agreement. The language "eighteen hundred * * * still in brokers hands" would indicate it was not beyond his power to sell. Either appellant forgot the provision respecting sale of his stock or the syndicate agreement was not enlarged beyond the original 4,000 shares covered by the written agreement.

Still another transaction is established by documentary proof.

After the syndicate agreement was negotiated and appellant was a party to the extent of 4,000 shares, he acquired 4,140 more shares of P & W stock. Thereafter, and during the life of the syndicate, he transferred 4,000 shares of his stock to Chase National Bank of New York to secure an obligation to Int. P. Co. This deposit might generally be described as collateral to an obligation to assume Int. P. Co.'s obligations to third parties. Significant is the fact that the payment of a large sum of money ($855,000) was only one requirement and even then consent of parties other than Int. P. Co. was necessary to secure its release.

If we assume for the purpose of the argument that the hypothecation of the 4,000 shares of stock was not such a sale as was prohibited by the syndicate agreement, it is somewhat persuasive on the issue before us. Appellant did not include any of that stock in the amount delivered November 12, for which he received the syndicate price. He did not get this stock released until after November 12, the delivery date fixed by appel-

lee. He used part of it to fill his share of the Sutro pool.[5] This he could not have done lawfully if it were covered by the syndicate agreement.

There is still other evidence pointing to the same conclusion.

Appellee sold the stock covered by the syndicate a few days before the 1929 stock market crash. Delivery by syndicate members was fixed as of November 12, a couple of weeks after the crash; place, New York City. On November 12, the market value was some $75 to $80 a share below the syndicate price.

Appellant's stock was in different hands and places; 4,000 shares were in possession of the Chase National Bank to secure the obligation of International Paper Company for $855,802.38; smaller amounts were in brokers' hands. Appellant obtained 2,400 shares from Charles E. Lewis Co.; 900 shares from Farnum, Winter & Co.; and 740 shares from Sutro Brothers.

The significant, if not the determinative fact is that the number of shares which he collected was 4,040 for which, if his story be true, he was to receive $170 per share. He instructed his brokers, however, to deliver only 4,000 shares and to place 40 shares on open account for him. Why was this done? If appellee were obligated to pay $170 per share for each share appellant owned, why did appellant not collect for the 4,040 shares? Likewise, there were 4,000 shares in the Chase National Bank. The difference between syndicate and market price on 4,000 shares was approximately $300,000 on November 12. To make up the syndicate requirement and also the third pool agreement (entirely separate from the syndicate but nevertheless taken care of by appellee when he sold the stock covered by the syndicate agreement), appellant needed 700 shares of the stock held by the Chase National Bank. He obtained a release of 700 shares. Later he obtained a release of the remaining 3,300 shares. Not until years had elapsed and not until the market value had sunk far below the then market value and to but a small fraction of the syndicate price did he demand payment pursuant to the syndicate agreement.

In the face of such fact contradiction the duty of the District Court to direct the verdict was clear. Had some of these facts which are so inconsistent with appellant's asserted modification of the agreement depended upon parol evidence, the case would have called for jury determination. But the evidence which refuted the oral modification is lodged in writings: telegrams, letters, book entries; the veracity of which cannot be and is not challenged. Coming as it does from appellant's pen, such evidence rises almost to the dignity of estoppel—at least to the assurance of thorough conviction. To permit a contrary verdict to stand would be a mistake, a miscarriage of justice. Our conclusion is that the District Court properly directed the verdict in favor of appellee.

The judgment **is**

Affirmed.

---

[5] Appellant and appellee were parties to three successive pools in P & W stock. They were independent of the agreement above set forth. Two of them were successfully terminated, and the third, known as the Sutro pool, was in force when appellee negotiated the stock covered by the syndicate agreement.